637 F.2d 749
 15 ERC 1361, 11 Envtl. L. Rep. 20,208
 BEAVER, BOUNTIFUL, ENTERPRISE, Ephraim, Fairview, Fillmore,
Heber, Holden, Hurricane, Hyrum, Kanosh, Kaysville, Lehi,
Logan, Meadow, Monroe, Morgan, Mt. Pleasant, Murray, Oak
City, Parowan, Spring City and St. George, Municipal
Corporations and Bodies Politic of the State of Utah, and
Anaheim, Burbank, Glendale, Pasadena, Riverside and Los
Angeles, Municipal Corporations and Bodies Politic of the
State of California, and Intermountain Power Project, a
Nonprofit Corporation of the State of Utah, Plaintiffs-Appellees,
v.
Cecil D. ANDRUS, Secretary, United States Department of the
Interior; Frank Gregg (Formerly Curt Berklund), Director of
the Bureau of Land Management, United States Department of
the Interior; Gary J. Wicks (formerly Paul Howard), Director
of the Utah State Office of the Bureau of Land Management,
Defendants-Appellants.
 No. 79-2267.
 United States Court of Appeals,
Tenth Circuit.
 Argued Oct. 17, 1980.
Decided Dec. 5, 1980.
 
 George K. Fadel, Bountiful, Utah, for plaintiffs-appellees.
 David Shilton, Dept. of Justice, Washington, D.C. (James W. Moorman, Asst. Atty. Gen., Jacques B. Gelin and James J. Tomkovicz, Attys., Dept. of Justice, Washington, D.C., and Ronald D. Rencher, U.S. Atty., and Wallace Boyack, Asst. U.S. Atty., Salt Lake City, Utah, with him on the brief) for defendants-appellants.
 Before McWILLIAMS, DOYLE and McKAY, Circuit Judges.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 This is an appeal by the Secretary of the Interior and others from a final judgment based on the grant of summary judgment on motion of the Plaintiffs-Appellees below. The plaintiffs had applied for permits and rights-of-way over federal lands in order to construct and operate electric power generating and distribution facilities. The Secretary of the Interior determined that the plaintiffs did not qualify for exemption from the recovery of costs incurred in processing their applications and assessed such costs against plaintiffs.
 
 
 2
 The cause turns on whether the intended use by the plaintiffs was such that it was unable to qualify or meet the test of "for governmental purposes".
 
 
 3
 Beaver, Bountiful and Enterprise, together with twenty-six other cities and towns in Utah and California, formed Intermountain Power Project (IPP), a non-profit corporation, which was organized to build and operate a coal-fueled steam electric generating plant in Southern Utah, and to provide power to cities and towns in Utah and California. The location of the power plant is intended to be on federal land administered by the Bureau of Land Management.
 
 
 4
 The government regulation 43 C.F.R., § 2802.1-2 provides that an applicant seeking a right-of-way permit must reimburse the United States for administrative costs incurred in the processing of the application. The regulation describes the costs which are assessed against an applicant, all prior to the issuance of the permit. The regulation also declares that state or local governments, or agencies or instrumentalities thereof, where the land will be used for government purposes and the land and resources will continue to serve the general public, are given immunity from the payment of the costs. The text of the regulation is as follows:
 
 
 5
 § 2802.1-2 Reimbursement of Costs.
 
 
 6
 (a)(1) An applicant for a right-of-way or a permit incident to a right-of-way shall reimburse the United States for administrative and other costs incurred by the United States in processing the application, including the preparation of reports and statements pursuant to the National Environmental Policy Act (42 U.S.C. §§ 4321-4347), before the right-of-way or permit will be issued under the regulations of this part.
 
 
 7
 (2) The regulations contained in this section do not apply to: (i) State or local governments or agencies or instrumentalities thereof where the lands will be used for governmental purposes and the lands and resources will continue to serve the general public, except as to rights-of-way or permits under Section 28 of the Mineral Leasing Act of 1920, as amended (87 Stat. 576); (ii) road use agreements or reciprocal road agreements; or (iii) Federal government agencies.
 
 
 8
 The administrative and legislative history behind the regulations appear to support the proposition that in order to qualify for the exemption, the test is, first, whether the entity seeking the exemption is a state or local government using the land for governmental purposes; and second, that the land and resources will continue to serve the general public. The Secretary-Appellant's position is that the present case is concerned with the test whether the lands and resources will continue to serve the general public. The Secretary further argues that not only must the applicant be a government entity, but it must be performing a service for the benefit of the public. The regulation, according to the Secretary, distinguishes between different groups of government entities and the distinction is drawn on the basis of who benefits from the land use. If there is a private benefit it appears unlikely that the entity would receive the exemption here in question.
 
 
 9
 The Secretary and the Interior Department maintain that the regulations are to be interpreted solely under the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1701. Section 1734 of this Act authorizes the Secretary to establish reasonable filing fees, service fees and charges to require a deposit of any payments tendered to reimburse the United States for reasonable costs in respect to applications and other documents. It makes the provision for depositing the money by the Secretary and also defines what constitutes reasonable costs.
 
 
 10
 The nonprofit corporation, Intermountain Power Project, was formed by numerous cities in California and Utah for the purpose of generating and distributing electrical power for the inhabitants of the municipalities. IPP was to investigate the feasibility of a proposed 3,000 megawatt coal-fired steam electric generating facility in Wayne and Emery Counties, South Central Utah. If it determined the project to be feasible, IPP was to formulate plans and an agreement to implement construction and operation of such a facility. IPP determined that the construction and operation of the proposed generating station and its supporting facilities required the use of federal property. Because of this, applications for rights-of-way and permits were made to the Bureau of Land Management. These applications remain pending.
 
 
 11
 In a letter dated June 18, 1975, the Bureau of Land Management informed IPP of the cost-recovery regulations, and also its determination that the exemptions for local governments was inapplicable to IPP. The total costs for the application processing were estimated to be $700,000. Initially, IPP was billed for $40,000 for costs through September, 1975. IPP objected and appealed to the Interior Board of Land Appeals. IBLA told IPP that it would postpone resolution of the case pending a decision in a similar case then pending in Colorado. It appears, however, that the opinion in that case, Public Service Company of Colorado v. Andrus, 433 F.Supp. 144, (D.C.1977) did not address the exemption issue which is involved in this case.
 
 
 12
 Another bill was sent to IPP for the period September 30, 1975 to October 31, 1975 in the amount of $15,000 for advance costs. The BLM noted that the processing of the application would be suspended until the assessment was paid. IPP paid under protest. Much of the originally estimated expenses and those ultimately paid were attributable to services which had been rendered by the Department of the Interior in compliance with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321, et seq., 83 Stat. 852.
 
 
 13
 In its original complaint herein, filed July 14, 1976, the Plaintiffs-Appellees alleged that the cost recovery regulations contained in 43 C.F.R. 2802 were not authorized by law. An injunction was sought against enforcement of such regulations, and a refund was prayed for the amounts already paid. The Plaintiffs-Appellees contended that they were exempt from cost reimbursement by virtue of the Independent Offices Appropriation Act of 1953 (IOAA), 31 U.S.C. § 483a; that the reimbursement regulations required payments for amounts not described and not authorized by the Public Land Administration Act, and that the regulations constituted an unconstitutional delegation of congressional power to tax.
 
 
 14
 Following pretrial, the Plaintiffs-Appellees filed a motion for summary judgment. The district court concluded that the Plaintiffs-Appellees were indeed exempt from the cost recovery requirements. The court further held that 43 C.F.R. 2802.1-2(a)(2), exemptions for reimbursements of costs for processing applications for rights-of-way, had included plaintiffs; that the plaintiffs were exempt and excluded from the IOAA provisions for payment of costs attributable to rights-of-way applications. The court's interpretation was that the costs had not been assessed pursuant to the FLPMA. It enjoined enforcement of the regulations against plaintiffs and directed that the defendants comply with the regulatory and statutory refund provisions. 43 C.F.R. 4302.1-2(a)(8); 43 U.S.C. § 1734(c).
 
 
 15
 After that the trial court denied the motion of the government to alter the judgment rendered. Formal entry of the judgment was not made, due to an oversight, until February 14, 1980. A notice of appeal from the summary judgment was filed November 26, 1979. An amended notice of appeal from both the summary judgment and the order denying the motion to alter was filed February 28, 1980.
 
 
 16
 The Secretary's position continues to be that in order for the IPP to be exempt from the payment of the fees for services provided it must benefit the public at large.
 
 Summary of Contentions
 
 17
 The Secretary's position is that the regulations must be interpreted exclusively under FLPMA and as so interpreted the Secretary is empowered to assess costs incurred in processing land use applications. The fact that the permittees include state or local governments is of no consequence of itself. It must appear that the land will be used so as to serve the general public. The Secretary does not accept the idea of a publicly owned utility or power source serving the general public because it is not open to the public fully and completely.
 
 
 18
 Beaver, Bountiful's position is that the Independent Offices Appropriation Act of 1952 (IOAA) and the Public Lands Administration Act (PLAA) or the Federal Land Policy and Management Act (FLPMA) serve to exempt from fees government entities which use the land to benefit the general public. Beaver, Bountiful further maintains that the generation and transmission of power by its nonprofit corporation for the people of IPP's geographical service area is a governmental use which continues to serve the general public as a class. Thus, the contention is that since the purpose is public, since it benefits the general public even though some of the land is not accessible to the general public, it is entitled to an exemption even though its area of operation is limited.
 
 
 19
 The ultimate issue then is whether an exemption exists only if the proposed use serves all of the public within a particular geographic area.
 
 
 20
 Regulations, Statutes and Legislative History
 
 
 21
 Section 1734 of FLPMA authorizes the Secretary to collect reasonable costs for the issuance of rights-of-way permits for the writing of environmental impact statements, for monitoring construction, operation, maintenance and termination of any authorized facility or other special activities. The Secretary is allowed to take into account in determining the reasonableness of the costs actual outlay, exclusive of management overhead, the monetary value of the rights or privileges sought by the applicant, the efficiency to the processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided, and other factors relevant to determining reasonableness.
 
 
 22
 In determining the reasonableness of the cost 43 U.S.C. § 1740 allows the Secretary to promulgate rules and regulations to carry out the purposes of the act and other laws applicable to the public lands. It further provides that the promulgation of such rules and regulations is to be governed by the provisions of Chapter 5 of Title V without regard to § 553(a)(2). Section 1764(g) of 43 U.S.C. provides as follows:
 
 
 23
 The holder of a right-of-way shall pay annually in advance the fair market value thereof as determined by the Secretary granting, issuing, or renewing such right-of-way: Provided, That when the annual rental is less than $100, the Secretary concerned may require advance payment for more than one year at a time: Provided further, That the Secretary concerned may waive rentals where a right-of-way is granted, issued, or renewed in reciprocation for a right-of-way conveyed to the United States in connection with a cooperative cost share program between the United States and the holder. The Secretary concerned may, by regulation or prior to promulgation of such regulations, as a condition of a right-of-way, require an applicant for or holder of a right-of-way to reimburse the United States for all reasonable administrative and other costs incurred in processing an application for such right-of-way and in inspection and monitoring of construction, operation, and termination of the facility pursuant to such right-of-way: Provided, however, That the Secretary concerned need not secure reimbursement in any situation where there is in existence a cooperative cost share right-of-way program between the United States and the holder of a right-of-way. Rights-of-way may be granted, issued or renewed to a Federal, State, or local government or any agency or instrumentality thereof, to nonprofit associations or nonprofit corporations which are not themselves controlled or owned by profitmaking corporations or business enterprises, or to a holder where he provides without or at reduced charges a valuable benefit to the public or to the programs of the Secretary concerned, or to a holder in connection with the authorized use or occupancy of Federal land for which the United States is already receiving compensation for such lesser charge, including free use as the Secretary concerned finds equitable and in the public interest.
 
 
 24
 Noteworthy is the fact that the above recognizes that rights-of-way may be granted, issued or renewed to a federal, state, or local government or any agency or instrumentality not controlled or owned by profit-making corporations or business enterprises, including free use as the Secretary finds equitable and in the public interest.
 
 
 25
 Apart from giving general recognition to the waiver of costs or parts of the assessed costs, the statutes are not entirely satisfactory in setting forth the conditions under which exemptions are to be extended or equitable considerations are to be taken into account in the assessment of costs. Perhaps the least general provision is found in the regulations which are said to be at issue in this case, and which are set forth at the outset of this opinion, 43 C.F.R. § 2802.1-2. As we have shown in the quoted regulation, there is a provision for reimbursement to the United States for administrative costs, including the preparation of reports and statements before the right-of-way permit will be issued. This is followed by Section 2 of the regulation, which states that regulations do not apply to state or local governments or agencies or instrumentalities thereof where the lands will be used for governmental purposes and the lands and resources will continue to serve the general public, except as to rights-of-way and permits under the Mineral Leasing Act (concerning fuel pipelines).
 
 
 26
 Thus, the standard is whether the lands will be used for government purposes and will serve the general public. The quest must be pursued with this standard in mind.
 
 
 27
 In 1950 in accordance with a Legislative Reorganization Act, Senator McClellan, who was then a member of the Committee on Appropriations and Chairman of the Subcommittee on Expenditures in Executive Departments (renamed the Committee on Government Operations), submitted to the Senate a committee report entitled "Fees for Special Services", S.Rep.No.2120, 81st Congress, 2d Sess. (1950), Serial Set No. 11370. This report provided, in part, as follows:
 
 
 28
 Thus at the outset, it is desired to draw a clear line of distinction between services which the Federal Government renders, either upon request or by law, to special interests to which benefits thereby accrue at the expense of all the taxpayers, and services for which the Government is inherently liable and the benefits of which accrue to the people at large. (At 1; Emphasis added)
 
 
 29
 In the several staff reports and press releases which have been issued, occasion has been taken to reiterate that philosophy and give reassurance that there is no thought here to establish a system of fees for fundamental Government services, but only to explore the feasibility and fairness of shifting to special beneficiaries the expense now being borne for them by the taxpayers at large. (At 3; Emphasis added)
 
 
 30
 The committee does not incline to the view that, in such instances, the cost to which the Government is put should be borne by the beneficiaries. Where there is joint benefit to a particular beneficiary and to all the people, the cost should be equitably divided, and where there is doubt as to the degree or preponderance of benefit, there should be no fee. (At 3-4; Emphasis added)
 
 
 31
 It is apparent from a reading of this report that a clear distinction was made between special interests to obtain benefits at the expense of the taxpayer and those services for which the government is inherently liable, the benefits of which accrue to the people at large. This distinction which is discussed throughout this report, is the thread that runs through all of the pertinent acts, and thus, like the facts presented in the case before us, must be analyzed in light of the philosophy that is expressed.
 
 
 32
 The Congressional Record contains other remarks of Senator McClellan, a part of which is as follows:
 
 
 33
 At the same time, the Senator repeated his assurance that the committee has no thought whatsoever of recommending that charges be made for services of which the beneficiaries are the general public; the study is aimed at determining the feasibility of charging for those services which benefit particular individuals, groups or interests.
 
 
 34
 96 Cong.Rec. A1914 (1950).
 
 
 35
 The Independent Offices Appropriation Act of 1952, which was a rider attached to the appropriations for all the various independent offices, generally stated that it was "the sense of the Congress that any work, service, publication, report, document, benefit, privilege, authority, use, franchise, license, permit, certificate, registration or other similar thing of value or utility performed", which is provided by "any Federal agency (including wholly owned Government corporations ...) to or for any person ... except those engaged in the transaction of official business of the Government shall be self-sustaining to the full extent possible ...". 41 U.S.C. § 483a (1976). This provision also authorized by regulation the prescribed fees, charges or prices, if any exist, to be fair and equitable, taking into account direct and indirect costs to the Government, value to the recipient, public policy or interest served and other pertinent facts. This section also calls for collection and payment to the Treasury, but says that nothing contained in the section is intended to repeal or modify the statutes prohibiting the collection, fixing the amount or directing the disposition of any fee or charge and finally concludes that it is not intended by that section to modify or repeal any existing law.
 
 
 36
 House Report No. 384, accompanying the Independent Offices Appropriations Act, expresses the concern that the government is not receiving full value for the services rendered to special beneficiaries. The report in general urges much more attention to the collection of these fees and costs. It concludes:
 
 
 37
 The bill would provide authority for government agencies to make charges for these services in cases where no charge is made at present, and to revise charges where present charges are too low, except in cases where the charge is specifically fixed by law or the law specifically provides that no charge shall be made. It is not the Committee's intention in including this provision to disturb existing practices with respect to charges for postal services, sales of power, or the interest on loans by the Government.
 
 
 38
 H.R.Rep.No.384, 82nd Cong., 1st Sess. 2-3 (1951), Serial Set No. 11496.
 
 
 39
 During the 1950's, when the above legislation was considered and enacted, there were no regulations for the recovery of costs incident to granting of rights-of-way and the Department of the Interior did not issue regulations covering reimbursement of costs on these permits until the mid-1970's. During this period, in 1960, Congress passed the Public Lands Administration Act; (since superseded by FLPMA) which Act reads in part as follows:
 
 
 40
 Notwithstanding any other provision of law, the Secretary of the Interior may establish reasonable filing fees, service fees and charges, and commissions with respect to applications and other documents relating to public lands and their resources under his jurisdiction, and may charge and abolish such fees, charges and commissions.
 
 
 41
 43 U.S.C. § 1371, 74 Stat. 506 (repealed 1976).
 
 
 42
 We have quoted PLAA to show that its theme is consistent with that of the 1952 Act (IOAA) and with FLPMA. All of the statutes start with discussion that the primary purpose is to cover the costs to the United States in processing the applications and end with the recognition of non-application to state or local government or agencies or instrumentalities thereof, except as to rights-of-way or permits under Section 28 of the Mineral Leasing Act. This is reflected in the preamble of the composite printing of the regulations, which provides:
 
 
 43
 The primary purpose of this amendment is to provide for the recovery of costs incurred by the United States in processing applications for rights-of-way and permits incident to rights-of-way across public lands.As to other rights-of-way, the proposed rules exempted state or local governments or agencies or instrumentalities thereof, and Federal government agencies. The final rules have been changed to clarify the intent of the provision. The provision contemplates exemptions for state and local governments or agencies or instrumentalities thereof only where the lands will be used for governmental purposes and the lands and resources will continue to serve the interests of the general public. It is not intended to exempt applicants because of governmental association where the cost of services to another applicant, without such association, for a similar right-of-way would be recovered. The principal involved is one of treating all applicants alike, regardless of status, and without consideration of whether costs will be passed on to ultimate consumers of a product or incurred directly by the applicant.
 
 
 44
 40 Fed.Reg. 17,841 at 17,841-42 (1975) (Emphasis added).
 
 
 45
 IPP's application was submitted to the Bureau of Land Management at the time the regulations in effect were issued pursuant to the PLAA, in 1975. With that in mind, Beaver, Bountiful contends that the regulations should be interpreted under the Independent Offices Appropriations Act of 1952, and pursuant to PLAA. The Secretary maintains that the FLPMA is the authorizing statute. This, of course, was adopted after the application was made. From an examination of the legislative history of this Act, we conclude that it makes no difference whether the judgment is made in light of the IOAA of 1952 or FLPMA. Examination of the legislative history of FLPMA supports the conclusion. S.Rep.No.94-583, 94th Cong., 1st Sess. 72-73 (1975); H.Rep.No.94-1163, 94th Cong., 2nd Sess. 19, reprinted in (1976) U.S.Code, Cong. & Ad.News, pp. 6175, 6193. See also, S.Rep.No.93-207, 93rd Cong., 1st Sess., reprinted in (1973) U.S.Code, Cong. & Ad.News, p. 2417 at 2450, which reiterates the interpretation of the IOAA, but relative to the Mineral Leasing Act.
 
 
 46
 Needless to say, the common thread of the various statutes and regulations continues to be that special beneficiaries of government services who are acting in their own interests should pay the costs of those services. No change in this philosophy is apparent in FLPMA. From the fact then that the regulations remain unchanged when they were repromulgated under FLPMA and from the further fact that Section 1740 tells the Secretary to continue to administer the public lands under existing rules until new ones are adopted, we believe it makes no difference as to which authority is used in deciding and making decisions as to whether the district court was correct in applying the relevant text and reaching the conclusion that Beaver, Bountiful is acting for the benefit of the public. It pretty much follows there is no significant difference as to whether FLPMA or IOAA are applicable to interpreting the regulations in question. True, in Alumet v. Andrus, 607 F.2d 911 (10 Cir., 1979), it was implied that FLPMA was the guideline, but the only issue in that case was whether the reimbursement could include the cost of an environmental impact statement and we then held that it would; but this is not out of harmony with the conclusion just above set forth. We did not consider whether the regulations would have been valid under all three Acts because BLM abandoned any reliance on those Acts in appeal of the Alumet case.
 
 
 47
 Are the Plaintiffs-Appellees Exempt from the Payments of the
 
 
 48
 Fees Which Are in Issue?
 
 
 49
 The evidence which we have examined falls short of an authoritative answer to the question which is in issue. By reason of this we found it necessary to consider all of the statutory information together with the regulations and legislative history. Although these materials are inconclusive they do provide guides. From these various materials it is our conclusion that state and local governments and agencies thereof where the lands and resources will continue to serve the general public are, under the law and regulations, entitled to the exemptions to which reference is repeatedly made.
 
 
 50
 The only exception which was taken by the Secretary was whether the use in question serves and will continue to serve the general public. The extent and the degree of the service to the public has been put in issue by the Secretary maintaining that the service must be complete and absolute. We are inclined to agree with this strict test, but we disagree with the Secretary's conclusion that the cities and towns which are before us will not dedicate the properties and efforts to service to the public. It is true that some of the lines-an inconsequential percentage-will transport electricity for a privately owned public utility. This special service is required by state statutes. We do not regard this as any deviation from the appellees' mission to devote its properties and efforts to public service.
 
 
 51
 The judgment of the District Court is affirmed.