711 F.2d 913
 21 ERC 2029, 15 Envtl. L. Rep. 20,821
 NEVADA POWER CO., Plaintiff-Appellee,
v.
James G. WATT, Secretary of the Interior, Frank Gregg,
Director of the Bureau of Land Management, and Paul L.
Howard, Director of the Utah State Office of the Bureau of
Land Management, Defendants-Appellants.
PUBLIC SERVICE COMPANY OF COLORADO, Idaho Power Company, The
Montana Power Company, Pacific Power & Light Company, Sierra
Pacific Power Company, Southern California Edison Company,
San Diego Gas and Electric Company, Plaintiffs- Appellees,
and Cross-Appellants,
v.
James G. WATT, Secretary of the Interior, Frank Gregg,
Director of the Bureau of Land Management, Dale R. Andrus,
Director of the Colorado State Office of the Bureau of Land
Management, Glendon E. Collins, Acting Director of the
Arizona State Office of the Bureau of Land Management, James
R. Ruch, Director of the California State Office of the
Bureau of Land Management, Robert O. Buffington, Director of
the Idaho State Office of the Bureau of Land Management,
Michael J. Penfold, Director of the Montana State Office of
the Bureau of Land Management, Edward Spang, Director of the
Nevada State Office of the Bureau of Land Management, E.J.
Petersen, Acting Director of the Oregon State Office of the
Bureau of Land Management, Dell Vail, Acting Director of the
Wyoming State Office of the Bureau of Land Management,
Defendants- Appellants, and Cross-Appellees.
COLORADO-UTE ELECTRIC ASSOCIATION, INC., Plaintiff-Appellant,
v.
James G. WATT, Secretary of the Interior, Frank Gregg,
Director of the Bureau of Land Management, Charles W.
Luscher, Acting State Director of the Colorado State Office
of the Bureau of Land Management, Defendants-Appellees.
 Nos. 81-1944, 81-2066, 81-2143 and 82-1304.
 United States Court of Appeals,
Tenth Circuit.
 June 16, 1983.
 
 Jacques B. Gelin, Atty., Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen. and Dirk D. Snel, Steven A. Herman, Eleanor M. Granger, Attys., Dept. of Justice and Marcia C. Lipson, Atty., Dept. of the Interior, Washington, D.C., with him on the brief), for defendants-appellees.
 
 
 1
 Francis M. Shea, Washington, D.C. (Richard T. Conway, James R. Bieke and Patrick M. Hanlon, Washington, D.C., with him on the brief), Shea & Gardner, Washington, D.C., for plaintiffs-appellees and cross-appellants, Public Service Company of Colorado.
 
 
 2
 Bryant O'Donnell and James R. McCotter of Kelly, Stansfield & O'Donnell, Denver, Colo., Paul L. Jaurequi, Boise, Idaho, on the briefs for Idaho Power Co.
 
 
 3
 Robert E. Sullivan and Edward F. Bartlett, Butte, Mont., on the briefs for the Montana Power Co.
 
 
 4
 Richard D. Bach and Gail L. Achterman of Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., on the briefs for Pacific Power & Light Co.
 
 
 5
 L. Earl Ligon, San Diego, Cal., on the briefs for San Diego Gas & Elec. Co.
 
 
 6
 Margaret A. Glodowski, Reno, Nev., on the briefs for Sierra Pacific Power Co.
 
 
 7
 John R. Bury and Tom P. Gilfoy, Rosemead, Cal., on the briefs for Southern California Edison Co.
 
 
 8
 Elliott Lee Pratt of Clyde, Pratt, Gibbs & Cahoon, Salt Lake City, Utah, for plaintiff-appellee, Nevada Power Co.
 
 
 9
 Stephen M. Mathis of Mathis & Koonce, P.C., Montrose, Colo., for plaintiff-appellant, Colorado-Ute Elec. Ass'n, Inc.
 
 
 10
 Before SETH, Chief Judge, and McWILLIAMS and SEYMOUR, Circuit Judges.
 
 
 11
 SEYMOUR, Circuit Judge.
 
 I.
 INTRODUCTION
 
 12
 These consolidated appeals present a question of first impression concerning the reimbursement to the government of costs incurred in processing applications for rights-of-way under the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701-1784 (1976 & Supp. V 1981) (FLPMA or Act). FLPMA authorizes the Secretary of the Department of the Interior to recover "reasonable costs" of processing applications for rights-of-way. FLPMA §§ 304, 310, 504(c), (g), 43 U.S.C. §§ 1734, 1740, 1764(c), (g).
 
 
 13
 Three district courts, in cases involving almost identical issues of fact and law, reached differing results on the central issue we must resolve here: whether the Secretary adequately considered the "reasonableness factors" listed in section 304(b) (hereinafter reasonableness factors or 304(b) factors) in assessing "reasonable costs" of processing to applicants for rights-of-way across the public lands. In Nevada Power Co. v. Watt, No. 81-1944, and Public Service Co. v. Watt (PSC II), Nos. 81-2066 and 81-2143, district courts in Utah and Colorado, respectively, held that the Secretary must consider the 304(b) factors, and that he had failed to do so adequately. The Secretary appeals in both cases, and the appellees in PSC II raise additional issues on cross-appeal. In Colorado-Ute Electric Ass'n v. Watt, No. 82-1304, another judge in the District of Colorado held that the Secretary was not required by law to consider the factors, and Colorado-Ute appeals.
 
 
 14
 These appeals raise a number of fairly straightforward legal issues. Where possible, common issues will be discussed collectively. Significantly different factual and legal issues will be discussed individually.
 
 II.
 HISTORY
 
 15
 A. Interior's Cost Reimbursement Regulations
 
 
 16
 1. The Independent Offices Appropriation Act and the Public Land Administration Act
 
 
 17
 Although our opinion primarily addresses Interior's cost-reimbursement practices under FLPMA, we must also consider cost-reimbursement under two earlier acts, the Independent Offices Appropriation Act (IOAA), 31 U.S.C. § 483a (1976), and the Public Land Administration Act (PLAA), 43 U.S.C. §§ 1371, 1374 (repealed 90 Stat. 2792 (1976)). Interior's FLPMA cost-reimbursement regulations had their genesis in regulations developed under the two earlier acts. The validity of the earlier regulations is raised for our examination in Colorado-Ute. We therefore discuss the development of the regulations under the earlier acts in order to provide the historical context for the FLPMA regulations and to facilitate our review of Colorado-Ute.
 
 
 18
 At all times pertinent to this appeal, federal policy has required persons seeking special permits to use the public lands to reimburse the government for costs incurred in processing their applications. Interior initially promulgated the cost reimbursement regulations here at issue in 1975, citing as authority, inter alia, Title V of the IOAA, 31 U.S.C. § 483a and sections 201 and 204 of the PLAA, 43 U.S.C. §§ 1371, 1374. 40 Fed.Reg. 17,841 (April 23, 1975); see 43 C.F.R. § 2802.1-2 (1975). The regulations provided that:
 
 
 19
 "An applicant for a right-of-way or a permit incident to a right-of-way shall reimburse the United States for administrative and other costs incurred by the United States in processing the application, including the preparation of reports and statements pursuant to the National Environmental Policy Act (42 U.S.C. 4321-4347), before the right-of-way or permit will be issued ...."
 
 Id. § 2802.1-2(a)(1).[1]
 
 20
 In January 1976, six western utility companies filed suit challenging the reimbursement regulations. The utilities sought declaratory and injunctive relief against application of the regulations on the grounds that the regulations exceeded the Secretary's statutory authority, and alternatively, that if the regulations were authorized, the statutes represented an unconstitutional delegation by Congress of the tax power. In Public Service Co. v. Andrus, 433 F.Supp. 144 (D.Colo.1977) (PSC I ), Judge Finesilver held that the IOAA and PLAA authorized Interior to recover costs only for services providing "special benefits to [applicants] beyond those which accrue to the public at large." Id. at 155. The judge found that environmental assessments and impact statements triggered by an application for a right-of-way were of general benefit to the public. Id. at 152-53. Because those studies did not "provide special benefits to [applicants] beyond those which accrue to the public at large," id. at 156, he held that their costs could not be charged to applicants. He enjoined Interior from enforcing the regulations "to the extent that they exceed the authority provided by" the PLAA and the IOAA. Id.
 
 
 21
 FLPMA became effective in October 1976. During the proceedings in PSC I, the plaintiffs moved to amend their complaint to challenge the regulations under FLPMA as well as the IOAA and the PLAA. The trial court denied the motion "[b]ecause the Secretary of the Interior has not yet interpreted the FLPMA nor, to [the court's] knowledge, issued regulations under it." Id. at 147 n. 2. Interior dismissed its appeal of PSC I on November 22, 1977, assertedly because FLPMA provided express new authority for cost reimbursement.
 
 
 22
 2. The Federal Land Policy and Management Act
 
 
 23
 FLPMA directs Interior to promulgate rules and regulations to carry out the purposes of the Act.[2] FLPMA § 310, 43 U.S.C. § 1740. Prior to such rulemaking, existing rules and regulations were to continue in force to the extent practicable. Id. The Act specifically authorizes the Secretary to issue regulations concerning rights-of-way:
 
 
 24
 "The Secretary ... may, by regulation or prior to promulgation of such regulations, as a condition of a right-of-way, require an applicant for or holder of a right-of-way to reimburse the United States for all reasonable administrative and other costs incurred in processing an application for such right-of-way and in inspection and monitoring of construction, operation, and termination of the facility pursuant to such right-of-way ...."
 
 
 25
 Id. § 504(g), 43 U.S.C. § 1764(g). Section 304 gives the Secretary more explicit authority to charge persons for applications relating to the public lands, including those for rights-of-way.
 
 
 26
 "(a) Notwithstanding any other provision of law, the Secretary may establish reasonable filing and service fees and reasonable charges, and commissions with respect to applications and other documents relating to the public lands and may change and abolish such fees, charges and commissions.
 
 
 27
 "(b) The Secretary is authorized to require a deposit of any payments intended to reimburse the United States for reasonable costs with respect to applications and other documents relating to such lands. ... As used in this section 'reasonable costs' include, but are not limited to, the costs of special studies; environmental impact statements; monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities. In determining whether costs are reasonable under this section, the Secretary may take into consideration actual costs (exclusive of management overhead), the monetary value of the rights or privileges sought by the applicant, the efficiency to the government processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided, and other factors relevant to determining the reasonableness of the costs."
 
 
 28
 43 U.S.C. § 1734.
 
 
 29
 On September 29, 1977, approximately four months after PSC I was decided, Interior promulgated Secretarial Order No. 3011, implementing FLPMA's reimbursement provisions. The order stated:
 
 
 30
 "The regulations at 43 CFR 2802.1-2 (1976) shall be applicable to ... applications [under section 304 of FLPMA] ... until new regulations implementing Title V of FLPMA become final. It is my finding that 'reasonable costs' under Sections [sic] 304 of FLPMA for processing applications for rights-of-way over public lands and for monitoring right-of-way holder activity, are the actual costs incurred by the United States in performing statutory responsibilities necessitated by such applications or rights-of-way. The term 'reasonable costs' means the same as the term 'administrative and other costs' as used in the regulations at 43 CFR 2802.1-2(a)(1) (1976), and includes costs incurred in preparation of environmental impact statements."
 
 
 31
 Secretarial Order No. 3011, 42 Fed.Reg. 55,280 (1977) (emphasis added). Subsequently, the reimbursement regulations were reissued, 45 Fed.Reg. 44,53 2 (1980), with an effective date of July 31, 1980. The reissued regulations are published at 43 C.F.R. § 2803.1-1 (1982), and except for their numeration are identical to the original regulations in all respects significant to this case.
 
 B. The Lawsuits Below
 
 32
 Two of the three suits in this appeal were tried as original actions in federal district court. The third, Colorado-Ute, sought review of an administrative decision of the Interior Board of Land Appeals (IBLA) in addition to declaratory and injunctive relief.
 
 1. Nevada Power Co. v. Watt
 
 33
 Nevada Power Company (Nevada Power) filed applications with the BLM for rights-of-way in Utah for the construction of the Allen-Warner Valley Electric Generation and Transmission System. The System was to supply electricity to portions of Nevada, California, and Utah. The BLM determined that the National Environmental Policy Act (NEPA) required the preparation of an environmental impact statement (EIS). During the processing of Nevada Power's applications, the BLM required the company to make payments under the reimbursement regulations for costs incurred, including those incurred in the preparation of the EIS. Nevada Power paid under protest.
 
 
 34
 Nevada Power filed suit in May 1978 in the District of Utah seeking a declaratory judgment that Interior's reimbursement regulations and reimbursement program are invalid, and that the Secretary is required to consider the reasonableness factors in determining reimbursement costs. Judge Christenson granted in part Nevada Power's motion for summary judgment. He interpreted the language of section 304(b) as mandatory rather than merely permissive, and held that Interior's reimbursement regulations were not authorized by FLPMA because they do not adequately consider the section's reasonableness factors. Nevada Power Co. v. Watt, 515 F.Supp. 307, 324 (D.Utah 1981). The judge rejected Interior's argument that the Secretary had considered the 304(b) factors, finding a "lack of any showing in the record that ... the factors enumerated in 304(b) were weighed at all." Id. at 325.
 
 2. Public Service Co. v. Watt (PSC II)
 
 35
 The plaintiffs in PSC II are utility companies (hereinafter referred to collectively as Public Service) that generate, transmit, and supply electric power in nine western states.[3] Public Service holds numerous rights-of-way over public lands and has additional applications for rights-of-way pending with the BLM. The BLM has charged Public Service for costs of processing applications, which Public Service has paid under protest. Public Service filed suit in the District of Colorado in February 1980, seeking declaratory and injunctive relief against the reimbursement regulations.
 
 
 36
 The trial court partially granted Public Service's motion for summary judgment. Judge Finesilver interpreted the language of section 304(b) as mandatory, rather than discretionary, PSC II, slip op. at 25, and held that the reimbursement regulations were not authorized by FLPMA because they precluded consideration of the section's reasonableness standards, id. at 26. Declaring that "[t]he rulemaking process is a singularly inappropriate vehicle by which to achieve compliance with FLPMA" in the determination of reimbursable costs, the judge stated that at least two of the reasonableness factors, "the public service provided" and "that portion of costs incurred for the benefit of the general public interest," must be considered on "an individual, case-by-case basis." Id. Additionally, Judge Finesilver held that Interior was collaterally estopped by his ruling in PSC I to relitigate the validity of the pre-FLPMA regulations. Id. at 15.
 
 
 37
 3. Colorado-Ute Electric Association v. Watt
 
 
 38
 Colorado-Ute is a public utility incorporated in Colorado as a cooperative association. Its thirteen members are Colorado corporations organized as cooperative associations or nonprofit corporations that retail electricity purchased from Colorado-Ute, which operates generation and transmission facilities.
 
 
 39
 In 1973, Colorado-Ute filed a right-of-way application with the BLM for a power line. The BLM assessed Colorado-Ute processing costs under pre-FLPMA reimbursement regulations, which the corporation paid under protest.
 
 
 40
 Colorado-Ute's right-of-way was granted in 1975, prior to FLPMA's enactment. The utility then filed a protest with the BLM seeking a refund of the costs it had been assessed. In January 1976, the BLM dismissed the protest. On administrative appeal, the IBLA affirmed in part and remanded in part, approving nearly all of the costs assessed by the BLM. In re Colorado-Ute, 46 I.B.L.A. 35 (1980). Colorado-Ute filed this suit in the District of Colorado in April 1980, seeking review of the IBLA decision. The utility also sought declaratory and injunctive relief against the BLM's application of the reissued regulations to two applications then pending and to its envisioned future applications.
 
 
 41
 Judge Carrigan granted Interior's motion for summary judgment, basing his opinion on an analysis of FLPMA. See Colorado-Ute Electric Ass'n v. Watt, 533 F.Supp. 197 (D.Colo.1982). The judge found that the language of section 304(b) was discretionary, and upheld the reimbursement regulations. In addition, he affirmed the IBLA decision without discussion.[4]
 
 III.
 MERITS OF THE APPEAL
 
 42
 The principal issues before us on appeal are common to all three suits. We must first decide whether Interior's consideration of the section 304 reasonableness factors in assessing reimbursement costs is mandatory or discretionary. If mandatory, we must then decide whether the agency adequately considered those factors in promulgating the reimbursement regulations. Second, we must examine chargeable costs and determine to what extent costs of environmental impact statements and other studies triggered by right-of-way applications may be assessed to the applicants. Third, we must consider whether the reimbursement regulations can be applied to recover costs incurred prior to FLPMA's passage. Finally, in reviewing Colorado-Ute, we must determine the validity of the pre-FLPMA regulations.
 
 A. The Statutory Language
 
 43
 Section 304(b) states that in determining reasonable costs for reimbursement, the Secretary "may take into consideration" the several listed factors. Interior argues that consideration of the reasonableness factors is purely discretionary--that the plain words of the statute should govern, and that "may" is permissive. Interior takes the position that for right-of-way applications, "reasonable costs" equals actual costs. The utilities contend that under the statute the Secretary must consider the reasonableness factors.
 
 
 44
 In resolving this conflict, we "must begin with the language of the statute itself." Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). "[T]he language of the statute itself is controlling when it is sufficiently clear in context," Blue Cross Ass'n v. Harris, 664 F.2d 806, 809 (10th Cir.1981) (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976)), and must prevail absent a conflict with the statute's legislative history, Aaron v. Securities & Exchange Commission, 446 U.S. 680, 699-700, 100 S.Ct. 1945, 1956-1957, 64 L.Ed.2d 611 (1980). See, e.g., Dickerson v. New Banner Institute, Inc., --- U.S. ----, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983); Watt v. Alaska, 451 U.S. 259, 266 & n. 9, 101 S.Ct. 1673, 1678 & n. 9, 68 L.Ed.2d 80 (1981). We must bear in mind that when a statute is ambiguous, the interpretation given it by the agency charged with its administration is entitled to deference. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Blue Cross Ass'n, 664 F.2d at 810. However, administrative interpretations are entitled to deference, not obeisance. An administrative construction will not be adopted if a different construction is plainly required. R.V. McGinnis Theatres & Pay T.V., Inc. v. Video Independent Theatres, Inc., 386 F.2d 592, 594 (10th Cir.1967), cert. denied, 390 U.S. 1014, 88 S.Ct. 1265, 20 L.Ed.2d 163 (1968); see Zuber v. Allen, 396 U.S. 168, 192-93, 90 S.Ct. 314, 327-28, 24 L.Ed.2d 345 (1969).
 
 
 45
 On first impression, Interior's argument--that "may" means "may"--is appealing. Under that analysis, however, the Secretary would be free to render superfluous the factors carefully set out in section 304(b). Such a result would not comport either with our reading of the statute, or with the rule that statutes must, where possible, be interpreted so as not to render any clause or provision unnecessary, contradictory, or insignificant. Equal Employment Opportunity Commission v. Continental Oil Co., 548 F.2d 884, 889 (10th Cir.1977); Zeigler Coal Co. v. Kleppe, 536 F.2d 398, 406 (D.C.Cir.1976); Parker v. United States, 448 F.2d 793, 797 (10th Cir.1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1255, 31 L.Ed.2d 455 (1972).
 
 
 46
 " 'May' ordinarily connotes discretion, but neither in lay nor legal understanding is this result inexorable. Rather, the conclusion to be reached 'depends on the context of the statute, and on whether it ... was the intention of the legislature to confer a discretionary power or to impose an imperative duty.' ". Thompson v. Clifford, 408 F.2d 154, 158 (D.C.Cir.1968) (footnotes omitted); see Farmers & Merchants Bank v. Federal Reserve Bank, 262 U.S. 649, 662, 43 S.Ct. 651, 656, 67 L.Ed. 1157 (1923); United States v. Cook, 432 F.2d 1093 (7th Cir.1970), cert. denied, 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971); United States v. Bowden, 182 F.2d 251, 252 (10th Cir.1950).
 
 
 47
 "The word 'may,' when used in a statute, usually implies some degree of discretion. This common-sense principle of statutory construction is by no means invariable, however, and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute."
 
 
 48
 United States v. Rodgers, --- U.S. ----, ----, 103 S.Ct. 2132, 2149, 76 L.Ed.2d 236 (1983) (footnote and citations omitted). See, e.g., Bennett v. Panama Canal Co., 475 F.2d 1280, 1282 (D.C.Cir.1973); United States v. Reeb, 433 F.2d 381, 383 (9th Cir.1970), cert. denied, 402 U.S. 912, 91 S.Ct. 1391, 28 L.Ed.2d 654 (1971); Wilshire Oil Co. v. Costello, 348 F.2d 241, 243 (9th Cir.1965). Courts have construed "may" to mean "must" when the statutory context and legislative history so required. See Massachusetts v. Andrus, 594 F.2d 872, 890 (1st Cir.1979); Thompson v. Clifford, 408 F.2d at 169; Kraft v. Board of Education, 247 F.Supp. 21, 24-25 (D.D.C.1965), cert. denied, 386 U.S. 958, 87 S.Ct. 1026, 18 L.Ed.2d 106 (1967); cf., e.g., Sierra Club v. Train, 557 F.2d 485 (5th Cir.1977) ("shall" means "may"). " 'Without question such a construction is proper in all cases where the legislature means to impose a positive and absolute duty, and not merely to give a discretionary power.' " United States ex rel. Siegel v. Thoman, 156 U.S. 353, 359, 15 S.Ct. 378, 380, 39 L.Ed. 450 (1895) (quoting Minor v. Mechanics' Bank, 26 U.S. (1 Pet.) 46, 64, 7 L.Ed. 47 (1828) (Story, J.)).
 
 
 49
 Sections 304(a) and 504(g) grant Interior authority to charge reasonable fees. Section 304(b) is not another grant of authority, but rather appears intended by Congress to establish the outer boundaries of the blanket delegation given the Secretary elsewhere. If section 304(b) were not intended to limit Interior's ability to assess fees, it would be mere surplusage because the Secretary receives the authorization to charge fees and require reimbursement from other sections of FLPMA. In some sense, then, the section's list of reasonableness factors must act as a constraint upon the general grant of authority to charge "reasonable" costs. We believe the section contemplates that the Secretary pay some attention to the listed factors in determining reasonable costs to be assessed.
 
 
 50
 Interior suggests that the factors were listed by Congress solely to provide helpful guidelines to the department's quest to identify the elements of "reasonable" costs. We do not take such a trivial view of Congress' explicit enunciation, noting that Congress further authorized the Secretary to consider "factors relevant" in the Secretary's expert opinion "to determining the reasonableness of the cost." If Congress' only intent were that posited by Interior, the listed factors could have been omitted entirely. The context and design of the statute indicate that section 304(b) was devised to restrict the Secretary's discretion.
 
 
 51
 We must interpret the statute to effect its clear purpose, Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979), and "evidenced congressional intent," Symons v. Chrysler Corp. Loan Guarantee Board, 670 F.2d 238, 242 (D.C.Cir.1981). The purpose suggested by the Act's structure is seemingly at odds with Congress' use of the word "may." Accordingly, this case is one in which we recognize that "while the clear meaning of statutory language is not to be ignored, 'words are inexact tools at best,' ... and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history." Tidewater Oil Co. v. United States, 409 U.S. 151, 157, 93 S.Ct. 408, 412, 34 L.Ed.2d 375 (1972) (citation omitted).
 
 B. The Legislative History
 
 52
 The language in section 304(b) represents a compromise between the equivalent provisions of the bills originally passed by the Senate and the House of Representatives. The Senate bill that was eventually enacted as FLPMA provided:
 
 
 53
 "(a) Notwithstanding any other provision of law, the Secretary may establish filing fees, service fees and charges, and commissions with respect to applications and other documents relating to national resource lands ....
 
 
 54
 "(b) The Secretary is authorized to require a deposit of any payments intended to reimburse the United States for extraordinary costs with respect to applications and other documents relating to national resource lands .... As used in this subsection, 'extraordinary costs' include but are not limited to the costs of special studies; environmental impact statements; monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities."
 
 
 55
 S. 507, 94th Cong., 2d Sess. § 302, 122 Cong.Rec. 4427 (1976). The committee report accompanying S. 507 commented:
 
 
 56
 "Section 302. Subsections (a) and (c) authorize the Secretary to establish fees and charges and to refund money erroneously paid ....
 
 
 57
 "Subsection (b) authorizes the Secretary to reimburse the extraordinary administrative and other costs incurred in processing applications and other documents relating to the national resource lands or in monitoring or other related special activities. Extraordinary costs include the costs of special studies; environmental impact statements; monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities .... It is expected that the Secretary will exercise flexibility in requiring reimbursement for extraordinary costs. The Secretary should take into consideration the extent to which applicants' proposals and the Federal programs to which the applications relate (e.g. proposals and programs concerning land and easement exchanges and cost-sharing agreements) are mutually beneficial to the Federal government and provide significant public benefits."
 
 
 58
 S.Rep. No. 583, 94th Cong., 1st Sess. 55-56 (1975), reprinted in Sen. Comm. on Energy & National Resources, Legislative History of the Federal Land Policy and Management Act of 1976, at 120-21 (1978) (emphasis added).
 
 The House counterpart to S. 507 provided:
 
 59
 "(a) Notwithstanding any other provision of law, the Secretary may establish reasonable filing and service fees and reasonable charges, and commissions with respect to applications and other documents relating to the public lands ....
 
 
 60
 "(b) The Secretary is authorized to require a deposit of any payments intended to reimburse the United States for reasonable costs with respect to applications and other documents relating to such lands.... As used in this subsection, 'reasonable costs' include but are not limited to the costs of monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities."
 
 
 61
 H.R. 13,777, 94th Cong., 2d Sess. § 303, 122 Cong.Rec. 23,464 (1976) (emphasis added). The accompanying committee report stated:
 
 
 62
 "The Secretary of the Interior is authorized to establish reasonable fees and charges and to refund moneys erroneously paid and to require reimbursement for 'reasonable costs.' The Committee expects collection of such costs only when the amounts are substantial and failure to collect would amount to an unwarranted subsidy by the Federal taxpayer. It expects also that the Secretar[y] will take into consideration the benefits to public programs in determining whether collection of specific costs is appropriate under this section and under Title V."
 
 
 63
 H.R.Rep. No. 1163, 94th Cong., 2d Sess. 15, reprinted in 1976 U.S.Code Cong. & Ad.News 6175, 6189 (emphasis added).
 
 
 64
 The differing cost recovery provisions were the subject of extensive discussion when the bills reached the Conference Committee.
 
 
 65
 "Mr. Quarles. The next matter of difference occurs on page 52, line three. This concerns the authorization of the Secretary to require to deposit by respective users of public lands the cost of processing the applications and other documents relating to that use.
 
 
 66
 "The Conferees will recall it is similar to a provision already in the Alaska Pipeline Bill. The Alaska Pipeline Bill did not have any adjective in front of costs, it simply said administrative costs. The Senate provision says extraordinary costs. The House provision says reasonable costs.
 
 
 67
 "After lengthy discussion amongst Staff in which it must be admitted Staff was not certain what the definition of either term would be, we concurred in suggesting at least for the Conferees consideration, the adjective 'Reasonable.' These would be the kind of costs that the Secretary could require deposits on.
 
 
 68
 "Congressman Santini. Is that agreeable with the Senate?
 
 
 69
 "Senator McClure. Mr. Chairman, I have very great difficulty with this. As we go into more and more specialized studies on use of the public lands, I know there will be a debate over whether the applicant who triggers the study ought to pay for that study, but those studies become very, very expensive.
 
 
 70
 "Sometimes they can involve thousands of dollars. I am not certain the applicant in every instance ought to bear those costs. It is a public land management requirement and not that of the applicant.
 
 
 71
 "...
 
 
 72
 "... [It] is the Bureau of Land Management's responsibility and should not in all instances be paid for by the applicant.
 
 
 73
 "...
 
 
 74
 "... [H]ow about the situation in which [an application for a non-intensive use of a small piece of land] would trigger a generalized land use study for a unit in which they would charge hundreds or thousands of dollars as a condition for a permit which was very much smaller than that? I think we have suddenly gotten far beyond simple administrative paper handling into the costs of hiring personnel and along with that, full range studies.
 
 
 75
 "Congressman Young. I can envision--I go back to the acquisition of a homesite, or the recreational site, the environmental impact statement would have to be filed, this could put everybody out of business.
 
 
 76
 "...
 
 
 77
 "Senator Haskell. I think Jim McClure has a point. I think there has to be a line drawn. I don't know how to do it, but my viewpoint is, where an application triggers the direct cost, that should be on the applicant. On the other hand, the applicant should not pay for the background studying and the developing of the overall plan. Now how we draw the line, Jim, I don't know. Can we pass this over and ask the Staff to be a little imaginative?
 
 
 78
 "Senator McClure. The Supreme Court has very recently said where the expenditure is for a public interest rather than a private interest, that it constitutes a tax and not a fee and specifically held in that instance, the fee could not be assessed.[5] I think we have that kind of problem when we look at EIS's which are really designed to protect the public interest rather than try to determine whether or not the applicant has a right.
 
 
 79
 "Senator Haskell. Let's assume a utility company asked to locate on public lands. This requires an EIS. Under your theory, would you have the utility company pay for the EIS or not?
 
 
 80
 "Senator McClure. I think not.
 
 
 81
 "Senator Haskell. Then we disagree.
 
 
 82
 "...
 
 
 83
 "Congressman Santini. I don't know if we will be able to reconcile the differences of the two concepts ....
 
 
 84
 "...
 
 
 85
 "... [W]e will pass on the issue of 'Reasonable' at line 52 in order to afford Staff an opportunity to review that language, number one, for constitutional validity; number two, for possible modification to meet the concerns expressed.
 
 
 86
 "Senator McClure. I responded as I did on the power line instances because I don't know where you draw the line .... I have to go all one way or all the other because I do not know how to draw a line that could stand the test short of that."
 
 
 87
 "Senator Haskell. I do not either, Jim. Maybe Staff can do something with this."
 
 
 88
 Senate House Conference Committee on S. 507 "Resource Lands Management," United States Senate, Unpublished Meeting and Markup Transcript at 28-32 (Sept. 15, 1976), reprinted in 18 Dep't of Interior, Legislative History of the Federal Land Policy and Management Act of 1976 (emphasis added).
 
 
 89
 The Conference Committee renewed its discussion of the costs issue in a subsequent committee meeting, at which the basic language of section 304(b) as enacted was introduced:
 
 
 90
 "Mr. Quarles. This, ... concerns the requirement of the deposit by an applicant for use of public land. A deposit is recovered in the Senate bill for extraordinary cost, and in the House bill, reasonable costs for processing their application.
 
 
 91
 "In addition, the provision attempts to define the House bill 'reasonable costs' and the Senate bill 'extraordinary costs.'
 
 
 92
 "The differences are, the Senate bill includes an environmental impact statement in some of the matters covered by the cost; whereas the House bill does not.
 
 
 93
 "...
 
 
 94
 "Congressman Young .... I have a suggestion from the staff of the minority side.
 
 
 95
 "...
 
 
 96
 "... [A]fter 'activities' insert the following: 'In determing [sic] whether charges are reasonable under this section, the Secretary may take into consideration actual costs exclusive to [sic] management overhead, or monetary value of rights or privileges sought by the applicant, the efficiency of the government processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided and other factors relative to determine the reasonableness of the charges.'
 
 
 97
 "...
 
 
 98
 "Senator Haskell. That sounds all right to me.
 
 
 99
 "Congressman Santini. It is pretty innocuous, Mr. Chairman.
 
 
 100
 "Senator McClure. Mr. Chairman, I assume what we are trying to do in this instance is to balance the equities that are involved, but we do not want to simply in every instance say that the government will absorb all of the costs of the studies and of the administrative procedures. But on the other hand, to say that we don't always want the applicant to bear all of the costs.
 
 
 101
 "There has got to be a reasonable balance between the two. I don't know how you define that because I do not think we would ever get Congress to agree that the applicant must pay all of them all of the time, nor will we get Congress to agree, nor this committee to agree, that the government would pay all of the costs in every instance.
 
 
 102
 "Perhaps we have to go with something like this.
 
 
 103
 "Senator Haskell. This is what this is saying. It gives guidelines.
 
 
 104
 "Senator McClure. I would assume also that this would allow an administrative review or a court review of the abuse of the person making the charges.
 
 
 105
 "I think it might be well to have the record reflect that that is what we intend with the addition of this language.
 
 
 106
 "Congressman Seiberling. This language looks perfectly okay. I am just wondering, though, whether this isn't the kind of thing that would be more appropriate in the conference report saying what we intend rather than writing it into the statute.
 
 
 107
 "...
 
 
 108
 "... Since 'reasonable' is a term which has to be interpreted anyway, the court could consider the legislative history.
 
 
 109
 "...
 
 
 110
 "Congressman Santini. I am interested in keeping the law actively engaged, but I think this has the merit of displaying the legislative intent in the statute.
 
 
 111
 "It seems in some instances of judicial review the expression of legislative intent defined in the reports is totally disregarded unless it is contained. I don't know that it represents monumental transmission one way or the other, but I think it would be a useful addition."
 
 
 112
 Id. at 25-28 (Sept. 20, 1976).
 
 
 113
 The conclusions of the Conference Committee were summarized in the conference report as follows:
 
 
 114
 "The Senate bill's and the House amendments' provisions for service charges differed in certain respects. The conferees acted on the differences as follows:
 
 
 115
 (a ) They adopted the House amendments' use of the adjective 'reasonable' to modify charges and costs; the adjective is implicit in the Senate bill except where the adjective 'extraordinary' was used. The conferees substituted 'reasonable' for 'extraordinary,' giving the Secretary of the Interior greater policy leeway in determining whether reimbursement of costs will be required at both the lower and upper levels of charges.
 
 
 116
 (b ) They agreed to eliminate direct appropriation of moneys paid for reimbursement of costs.
 
 
 117
 (c ) They agreed to mention specifically the 'reasonable costs' of doing special studies and preparing environmental impact statements as was done in the Senate bill. The conferees wrote into the bill factors to be considered by the Secretary in determining whether charges are in fact reasonable."
 
 
 118
 H.R.Conf.Rep. No. 1724, 94th Cong., 2d Sess. 61, reprinted in 1976 U.S.Code Cong. & Ad.News 6228, 6233 (emphasis added).
 
 
 119
 Our review of this unusually abundant legislative history reinforces our conclusion that the reasonableness factors were intended to limit the Secretary's authorization to charge reasonable costs. The factors were added to ensure that applicants would not as a matter of course bear all of the costs occasioned by their application.[6] On the other hand, private enterprises were not to be subsidized by requiring the government to shoulder all of the costs. The conferees sought to draw a line between the two extremes; the reasonableness factors constitute that line. To suggest that the Secretary may completely disregard that line flouts the clear expression of congressional intent contained in the legislative history.[7] The congressional intent expressed by the inclusion of the reasonableness factors is aptly summarized in the conferees' report: "The conferees wrote into the bill factors to be considered by the Secretary in determining whether charges are in fact reasonable."[8] H.R.Conf.Rep. No. 1724, supra, at 61, U.S.Code Cong. & Ad.News 1976, p. 6233 (emphasis added). We hold that the Secretary must, when establishing reasonable costs of processing applications, consider the reasonableness factors listed in section 304(b).[9]C. The Reimbursement Regulations
 
 
 120
 Interior next argues that even if the Secretary is required to examine the factors, he has in fact done so. Interior asserts that because the current regulations are substantially the same as those promulgated in 1976 under the PLAA and the IOAA, and because Secretarial Order 3011 made the earlier regulations applicable under FLPMA until new regulations were issued, "the consideration given by the Secretary to the factors listed in Section 304(b) at any point in this continuum would ... fulfill any duty he had under FLPMA to consider those factors." Interior Brief at 39, Nevada Power Co. However, even applying Interior's continuum theory, the validity of which we do not now decide, the consideration given the reasonableness factors by Interior was inadequate.
 
 
 121
 Interior alleges that the preambles to the proposed and final regulations on cost reimbursement under the IOAA, PLAA, and FLPMA reflect consideration of every one of the factors listed in section 304(b). Interior also asserts that the factor "the efficiency to the government processing involved" was considered, because charging actual costs eliminated the need for further appropriations to finance application processing and the delays that would thus occur. Rec., vol. III, PSC II at 207, p 49.a. (iii). Furthermore, Interior argues, "that portion of the costs incurred for the benefit of the general public interest" and "the public service provided" were adequately considered because the Secretary exempts from reimbursement requirements (1) state or local governments in certain circumstances when the right-of-way is for government purposes serving the general public, (2) road use agreements and reciprocal road use agreements, and (3) federal agencies. Id. at 205-06, p 47; 207-08, p 49.a. (iv).
 
 
 122
 The contention that the 304(b) factors were adequately considered is belied by Interior's stipulation that "[n]o consideration was given to the 'monetary value of the rights or privileges sought by the applicant,' [because] [t]his would require an independent economic review of each application which would be inefficient to government processing of applications." Id. at 207, p 49.a. (ii). Outright rejection of a factor required by Congress to be considered in assessing "reasonable costs" in no way constitutes the active consideration and application mandated by Congress.[10]
 
 
 123
 A brief examination of the documents relied upon by Interior to show active consideration of the reasonableness factors further convinces us we need not linger over this contention.[11] The regulations do not reveal the effective consideration that must be given each of the 304(b) factors; indeed, as the trial court in Nevada Power Co. noted, there is no showing in the record that the factors other than actual costs were considered at all. 515 F.Supp. at 325. The final cost-reimbursement regulations, published at 43 C.F.R. § 2803.1-1, are inconsistent with FLPMA and in excess of the authority therein granted and are therefore invalid.[12] See King v. United States, 545 F.2d 700, 706 (10th Cir.1976).
 
 D. Rulemaking versus Adjudication
 
 124
 As a result of our holding, Interior must reconsider how "reasonable costs" of application for rights-of-way are to be determined. The trial court in PSC II declared that "[t]he rulemaking process is a singularly inappropriate vehicle by which to achieve compliance with FLPMA," and that consideration of at least the public versus private benefit and the public service standards "must be made on an individual, case-by-case basis." Slip op. at 26. The court in Nevada Power Co. reached a similar conclusion. See 515 F.Supp. at 325. We are unwilling to go so far. "[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947).
 
 
 125
 We will not dictate the process to be used by Interior in weighing the factors listed in section 304(b). Interior is far better informed than is this court concerning the steps necessary to implement our holding. Although it is difficult to envision in what manner "the monetary value of the rights or privileges sought," the "portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant," or "the public service provided" may be calculated other than by a determination in an individual case, Interior is free to do so by whatever means it finds practicable. The Department may, if it so chooses, use rulemaking as far as possible to achieve this result, bearing in mind only that "the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule." Id.
 
 
 126
 In summary, the Secretary must examine and weigh each of the factors listed in section 304(b), as well as whatever other factors he finds relevant, in determining the "reasonable costs" allowed by FLPMA to be assessed. The touchstone of the Secretary's determination is reasonableness, and the Secretary is thus vested with considerable discretion in performing the weighing mandated by section 304(b), whether by rulemaking or adjudication. However, we echo the trial court's admonition in Nevada Power Co. that the Secretary must provide a reasonably articulate record showing the bases of the determination so that a reviewing court might determine whether the action is in accordance with FLPMA. The record must be adequate to show that "consideration was given to the relevant factors and that the consideration was sufficiently meaningful to commend deference by the court." Nevada Power Co., 515 F.Supp. at 325. See Dunlop v. Bachowski, 421 U.S. 560, 571-72, 95 S.Ct. 1851, 1859-60, 44 L.Ed.2d 377 (1975); see generally National Lime Ass'n v. Environmental Protection Agency, 627 F.2d 416, 451-53 (D.C.Cir.1980).
 
 E. Chargeable Costs
 1. Costs of environmental impact statements
 
 127
 Interior's practice of charging applicants for the costs of environmental impact statements triggered by right-of-way applications is a major issue of this appeal. The utilities argue that they should not be charged for the total costs of EIS preparation.[13] They also argue that it is not reasonable under the Act to charge applicants for portions of an EIS that address impacts occurring on private lands apart from the right-of-way sought.[14]
 
 
 128
 We note initially that this circuit has previously considered and rejected the argument that Interior may not require applicants for rights-of-way to reimburse any part of the cost of an EIS prepared in connection with processing their applications. In Alumet v. Andrus, 607 F.2d 911 (10th Cir.1979), we held that FLPMA requires all reasonable costs incurred by the Secretary in processing applications to be chargeable against the applicant, and that those reasonable costs include costs of an EIS. Id. at 916. We expressly rejected the contention that an EIS "inures solely to the benefit of the general public, and therefore, no part is assessable to the applicant." Id. We also considered and rejected the trial court's alternative holding that the provision in section 304(b) directing Interior to consider " 'that portion of the costs incurred for the benefit of the general public rather than for the exclusive benefit of the applicant' ... completely negated the former provision in the same statute that reasonable costs included the cost of an environmental impact statement." Id. (emphasis in original). We held that the latter provision "may well modify the earlier provision ... but [it] does not, in effect, excise the former provision from the statute." Id. (emphasis in original).[15]
 
 
 129
 Our construction of section 304(b) in the present case is in full accord with our holding in Alumet. The reasonableness factors do indeed modify the provision that " 'reasonable costs' include ... the costs of ... environmental impact statements." FLPMA § 304(b). The Secretary must consider the reasonableness factors when assessing "reasonable costs" of preparing an EIS triggered by an application.
 
 
 130
 The utilities argue that it is not "reasonable" under FLPMA to charge applicants for costs of studies examining the impacts of the applicants' projects that are caused by facilities or activities not located within the right-of-way sought. Their argument hinges on the assertion that such studies primarily benefit the public, because they "[go] so far beyond what [the applicant] seeks from the BLM," namely, the right-of-way. Brief for Public Service at 50. The utilities also assert that charging for those often-massive studies contributes to the disproportion between costs of processing and the monetary value of the easement sought.
 
 
 131
 The trial court in PSC II treated this issue under the rubric of NEPA, stating that "an EIS which conforms to the requirements of NEPA cannot be unreasonable for the purposes of FLPMA," slip op. at 28, "notwithstanding the fact that a considerable portion of the statement may speak to the environmental impact of a right-of-way on non-federal lands," id. at 29. The court cautioned that "the scope of an EIS ... should generally be a factor in the agency's consideration of the costs incurred for the benefit of the public at large." Id. (emphasis added). The district court in Nevada Power Co. apparently reached a similar result, rejecting the notion that total costs of an EIS are made "reasonable per se" by their inclusion in the first provision of section 304(b). See 515 F.Supp. at 317-22. The court held that
 
 
 132
 "the standard for any inclusion of costs [including those of an EIS] ... is reasonableness ....
 
 
 133
 "... Congress recognized that no hard and fast rule concerning EIS's should be crystallized with reference to every EIS, but the problem should be left for decision in view of the circumstances of each particular case with due consideration of the standards incorporated by Congress to guide and limit that discretion."
 
 
 134
 Id. at 322.
 
 
 135
 Interior argues strenuously that FLPMA permits recovery of the full cost of an EIS necessitated by an application, even when the EIS considers impacts beyond the right-of-way itself. The parties' battle is joined in a field of caselaw extrinsic to that of FLPMA itself; thus, although our holding is dictated by our examination of FLPMA's legislative history, we shall briefly examine the cases upon which the parties rely. This examination will also guide our later consideration of the validity of the pre-FLPMA cost-reimbursement regulations.
 
 
 136
 In the companion cases of National Cable Television Ass'n v. United States, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), and Federal Power Commission v. New England Power Co., 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974), the Supreme Court addressed the claim that fees assessed under the IOAA to industry members were "taxes" levied by administrative agencies and therefore unconstitutional. The Court held that the IOAA granted agencies only the power to assess fees and not taxes, thereby avoiding the constitutional issue.
 
 
 137
 In National Cable, the Court described a "fee" as "incident to a voluntary act, e.g., a request that a public agency permit an applicant to practice law ... or run a broadcast station. [An] agency ... normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society." 415 U.S. at 340-41, 94 S.Ct. at 1148-49. The Court said that assessing industry members for the costs of oversight over the entire industry would require the members to pay "not only for benefits they received but for the protective services rendered the public by the Commission" in its regulatory role, and suggested that such an assessment might be an unconstitutional tax. See id. at 341-42, 94 S.Ct. at 1149.
 
 
 138
 In New England Power Co., the Court stated that charges " 'should be made to each identifiable recipient for a measurable unit or amount of Government service or property from which he derives a special benefit,' " and "that no charge should be made for services rendered, 'when the identification of the ultimate beneficiary is obscure and the service can be primarily considered as benefitting broadly the general public.' " 415 U.S. at 349-50, 94 S.Ct. at 1154 (quoting with approval a Bureau of the Budget interpretation) (emphasis in original). The Court said that such a construction "keeps [the Act] within the boundaries of the 'fee' system and away from the domain of 'taxes.' " Id. at 351, 94 S.Ct. at 1155. Consequently, the Court struck down the cost-charge systems in both cases because they explicitly assessed an industry member with the agencies' costs of regulating the entire industry, rather than with that portion of the agencies' costs incurred in agency actions relating specifically to the industry member. In so doing, it noted that "[c]ertainly some of the costs [of regulating an industry] inured to the benefit of the public." National Cable, 415 U.S. at 343, 94 S.Ct. at 1150.
 
 
 139
 The utilities argue that National Cable and New England Power Co. support their EIS argument, reasoning that an EIS primarily benefits the public and thus cannot be charged to an applicant. Interior disagrees, citing Mississippi Power & Light Co. v. United States Nuclear Regulatory Commission, 601 F.2d 223 (5th Cir.1979), cert. denied, 444 U.S. 1102, 100 S.Ct. 1066, 62 L.Ed.2d 787 (1980). In Mississippi Power, the Fifth Circuit examined both National Cable and New England Power Co., and then held that the NRC could "recover the full cost of providing a service to an identifiable beneficiary, regardless of the incidental public benefits flowing from the provision of that service." Id. at 230 (emphasis in original). Accordingly, the court held that the Commission could recover from a license applicant the full costs of conducting environmental reviews required under NEPA "because they are a prerequisite to the issuance of a license.... The Commission must conduct these reviews before it can issue a license to an applicant; it is a necessary part of the cost of providing a special benefit to the licensee. In other words, it is 'incident to a voluntary act.' " Id. at 231 (quoting National Cable, 415 U.S. at 340, 94 S.Ct. at 1148) (footnote omitted). It mattered not that there was an "obvious public benefit flowing from the preparation of these environmental reviews." Id.
 
 
 140
 The charges for environmental impact statements at issue in this case represent the costs of studies required by law to be performed when an application triggers NEPA. See National Environmental Policy Act of 1969, § 102(2)(C), 42 U.S.C. § 4332(2)(C) (1976). They are therefore unlike the charges struck down in National Cable and New England Power Co. These studies are a necessary prerequisite to the receipt by the applicant of a "special benefit," the grant of a right-of-way. Therefore, Interior is not restrained by the doctrine laid out in National Cable and New England Power Co. from charging the full cost of such an EIS to the applicant. Mississippi Power, 601 F.2d at 231. However, FLPMA requires the Secretary to consider "that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant" in determining "reasonable costs." FLPMA § 304(b). Although the preparation of an EIS may be triggered by an application, beyond a doubt it confers benefits on the general public as well. Hence, because of FLPMA's affirmative command, Interior must consider the benefit to the public interest when it determines "reasonable costs" of processing.
 
 
 141
 It is admittedly difficult to draw a bright line between an EIS's "general public benefit" and the benefit to the applicant. Certainly it does not depend on a distinction made between costs of studies of the effects within the right-of-way granted and NEPA-required studies of its effects on lands outside of the grant, since presumably an application could not be granted if the EIS were less than sufficient by NEPA's standards. Nonetheless, Congress' inclusion of the reasonableness factors requires that Interior consider the problem, however metaphysical it may be.[16] Interior may charge an applicant for the "reasonable" costs of EIS preparation.
 
 
 142
 2. Costs for work required even in the absence of a right-of-way application
 
 
 143
 Public Service argues that Interior charges applicants for work that would have been done even absent an application. Interior denies this allegation and asserts: "The Secretary believes that he is not authorized to charge, and in fact does not charge, right-of-way applicants for work that would have been done in the absence of a right-of-way application." Reply Brief at 4. The utilities have identified no specific examples of charges for work that would have been done absent an application. We find the Secretary's interpretation of his authority, as quoted above, reasonable under FLPMA in light of our construction of section 304(b).
 
 3. Management overhead costs
 
 144
 Section 304(b) states that in determining reasonable costs, the Secretary is to consider "actual costs (exclusive of management overhead)." Public Service argues that Interior's stipulated practice of charging applicants for certain "indirect costs" incurred by the agency, constitutes a charge for "management overhead." Interior replies that by regulation it excludes work deemed "management overhead" from "indirect costs." The utilities argue that all "indirect costs"--i.e., costs not allocable to specific applications--should be excluded as "management overhead."
 
 
 145
 The district court in PSC II expressly declined to reach this issue because of its disposition of the case, expecting Interior to properly apply and explain its application of the overhead exclusion in assessing "reasonable" costs under section 304(b). See slip op. at 27. We do not address this issue here beyond noting that Interior is authorized by section 504(g) to collect "reasonable administrative and other costs." The exclusion of "management overhead," under our interpretation of section 304(b), modifies the authority granted in section 504(g) but does not negate it. We expect that Interior will, when calculating reasonable costs of processing, consider the factors listed in section 304(b) as construed in our opinion, as well as the Supreme Court's warning in National Cable and New England Power Co. that an applicant may not be charged for work relating to the agency's general costs of administration.
 
 F. Retroactive Application
 
 146
 Public Service argues that Interior may not use the FLPMA reimbursement regulations to recover costs incurred prior to the Act's passage. Interior asserts that FLPMA expressly authorizes such recovery:
 
 
 147
 "Effective on and after October 21, 1976, no right-of-way for the purposes listed in this subchapter shall be granted, issued, or renewed ... except under and subject to the provisions, limitations, and conditions of this subchapter .... Any pending application for a right-of-way under any other law on the effective date of this section shall be considered as an application under this subchapter."
 
 
 148
 FLPMA § 510(a), 43 U.S.C. § 1770 (emphasis added).
 
 
 149
 We must decide whether this language reflects congressional intent that Interior recover costs under FLPMA incurred prior to the Act's passage in processing applications for rights-of-way that were still pending on the date of enactment.
 
 
 150
 "[T]he first rule of construction is that legislation must be considered as addressed to the future, not to the past.... [A] retrospective operation will not be given to a statute which interferes with antecedent rights, or by which human action is regulated, unless such be 'the unequivocal and inflexible import of the terms and the manifest intention' of the legislature."
 
 
 151
 Union Pacific Railroad v. Laramie Stock Yards Co., 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913) (quoting United States v. Heth, 7 U.S. (3 Cranch) 399, 413, 2 L.Ed. 479 (1806)). This circuit has said that "[n]ormally, retroactive application of legislative acts is impermissible absent a clear indication of congressional intent." Jensen v. United States, 662 F.2d 664, 667 (10th Cir.1981); accord Edgar v. Fred Jones Lincoln-Mercury, 524 F.2d 162 (10th Cir.1975).
 
 
 152
 The question before us is purely one of legislative intent. This intent must be gleaned from the statute for there is little legislative history on the point. We believe the language of section 510(a) indicates that Congress intended costs to be assessed retroactively. Accordingly, we hold that Interior may charge applicants for rights-of-way pending at the date of FLPMA's enactment for "reasonable" costs of processing incurred prior to the Act's passage. See generally Hunter v. Morton, 529 F.2d 645, 648-49 (10th Cir.1976); Hannifin v. Morton, 444 F.2d 200, 202-03 (10th Cir.1971); Southwestern Petroleum Corp. v. Udall, 361 F.2d 650, 654-55 (10th Cir.1966).
 
 G. The Pre-FLPMA Reimbursement Regulations
 
 153
 Finally, we must consider the validity of the pre-FLPMA regulations and the effect of the trial court's holding in PSC I upon the cases on appeal here. The pre-FLPMA regulations were litigated in PSC I, where the trial court held that under the IOAA and the PLAA, Interior could recover only costs for services providing special benefits to applicants beyond those accruing to the public at large. The court held specifically that the costs of an EIS could not be charged to applicants because they did not "provide special benefits to [applicants] beyond those which accrue to the public at large." PSC I, 433 F.Supp. at 156.
 
 
 154
 One of the parties in PSC II, Sierra Pacific, was granted its right-of-way on July 6, 1976, three months prior to FLPMA's enactment. Interior charged costs against Sierra Pacific under the reimbursement regulations promulgated under the IOAA and PLAA, and not under the FLPMA regulations that we have struck down today. The trial court in PSC II held Interior collaterally estopped from contesting the validity of the pre-FLPMA regulations. PSC II, slip op. at 15. We agree that Interior is estopped to recover costs from Sierra Pacific under the earlier regulations,[17] and that those costs actually collected must be refunded.
 
 
 155
 The pre-FLPMA regulations are also involved in Colorado-Ute. In that case, the trial court affirmed an IBLA decision imposing reimbursement costs on Colorado-Ute for expenses incurred in processing its application for a right-of-way granted prior to FLPMA, based on pre-FLPMA regulations. Colorado-Ute argues on appeal that Interior should be collaterally estopped from contesting the regulations' validity because the issue was fully litigated in PSC I. However, Colorado-Ute did not raise this issue in the trial court, but instead contested the regulations on the merits. The utility may not raise this issue for the first time on appeal. See, e.g., Bradford v. United States ex rel. Department of Interior, 651 F.2d 700, 704 (10th Cir.1981). The pre-FLPMA regulations were before the trial court, and its determination is open to our review on appeal.
 
 
 156
 The pre-FLPMA regulations were promulgated under the authority of the IOAA and the PLAA. Because we find the IOAA[18] dispositive, we do not address the other alleged sources of authority. Unlike FLPMA, the IOAA provides little legislative history relevant to cost reimbursement. Other than the statutory command that fees charged be "fair and equitable," 31 U.S.C. § 483a, the IOAA reveals none of the evidence of Congressional intent that we found so compelling in construing FLPMA § 304(b). Colorado-Ute's only substantive argument is that the regulations were invalid under National Cable and New England Power Co.
 
 
 157
 We have discussed those cases earlier in this opinion, and we will not repeat that discussion here. Interior may, consonant with National Cable and New England Power Co., recover the full costs of services provided to Colorado-Ute as an identifiable beneficiary. These costs may include the full expenses of an EIS triggered under NEPA by Colorado-Ute's application.[19] Interior may not charge Colorado-Ute with general management costs and other expenses not incurred in agency action relating specifically to Colorado-Ute's application. See Mississippi Power, 601 F.2d at 230.
 
 
 158
 The trial court's affirmance of the costs assessed against Colorado-Ute was apparently based on its analysis of FLPMA. We remand so that it may reexamine those charges under the IOAA in light of our opinion.
 
 IV.
 CONCLUSION
 
 159
 In conclusion, we hold that Interior must consider the factors listed in section 304(b) in establishing reasonable costs of processing applications for rights-of-way under FLPMA for reimbursement purposes. Because Interior did not adequately do so in promulgating its cost-reimbursement regulations, the regulations are invalid as inconsistent with and in excess of the authority granted by FLPMA. Interior may, consistently with this opinion, determine and assess the reasonable costs of processing an individual application either by rulemaking or by case-by-case adjudication. Reasonable costs of processing include the reasonable costs of EIS preparation, as determined using the section 304(b) factors.
 
 
 160
 Where applications pending on the date of FLPMA's enactment are concerned, we hold that FLPMA authorizes the recovery of reasonable costs of processing incurred by Interior prior to that date. With respect to Colorado-Ute only, we hold that Interior may properly charge the actual costs of processing Colorado-Ute's pre-FLPMA applications.
 
 
 161
 We have considered the other issues raised in these three cases and find them to be without merit. Colorado-Ute is accordingly reversed in part. PSC II and Nevada Power Co. are affirmed insofar as they are consistent with this opinion. All three cases are remanded for further proceedings in accordance herewith.
 
 
 
 [1]
 Under the regulations, applicants were required to submit a payment at the time of application based on the length or size of the right-of-way sought. 43 C.F.R. § 2802.1-2(a)(3) (1976). If the BLM determined that estimated costs would exceed the initial payment by an amount greater than the government's costs of cost record maintenance, additional periodic payments were required. Id. § 2802.1-2(a)(4). Payments in excess of actual costs were refundable. Id. § 2802.1-2(a)(4)-2(a)(8). Applicants whose applications were denied or withdrawn were nonetheless responsible for reimbursing processing costs incurred by the government. Id. § 2802.1-2(a)(6), (7). The regulations further required applicants whose applications were granted to reimburse the government for costs incurred in monitoring construction and operation of authorized facilities on the right-of-way, and for costs of protection and rehabilitation of the lands involved. Id. § 2802.1-2(b)(1)
 
 
 [2]
 The Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701-1784 (1976 & Supp. V 1981), provides the Department of the Interior's Bureau of Land Management with comprehensive statutory authority to manage the "public lands." See FLPMA § 103(e), 43 U.S.C. § 1702(e). The Act directs the Bureau and the Department in the administration of some 450 million acres of federal land. See H.Rep. No. 1163, 94th Cong., 2d Sess. 2, reprinted in 1976 U.S.Code Cong. & Ad.News 6175, 6176
 
 
 [3]
 Arizona, California, Colorado, Idaho, Montana, Nevada, Oregon, Washington, and Wyoming
 
 
 [4]
 Colorado-Ute's administrative appeal concerned charges assessed under the pre-FLPMA reimbursement regulations for a right-of-way granted prior to FLPMA's enactment. The IBLA decision was explicitly based on pre-FLPMA law and regulations. See Colorado-Ute Elec. Ass'n, 45 I.B.L.A. 35 (1980). Nonetheless, the district court couched its opinion solely in terms of FLPMA on the theory that it was sufficiently similar to the IOAA and the PLAA to be analyzed identically
 
 
 [5]
 By this, Senator McClure was presumably referring to Federal Power Comm'n v. New England Power Co., 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974) and National Cable Television Ass'n v. United States, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), discussed in text infra part III.E.1
 
 
 [6]
 We do not imply that Interior may never require an applicant to bear all of the costs of processing an application. We emphasize that before assessing any costs, Interior must give thorough consideration to the 304(b) factors
 
 
 [7]
 Interior seeks to diminish the import of the legislative history by pointing out that one of the conferees, Senator Haskell, referred to the reasonableness factors as "guidelines." Guidelines they are. But they are guidelines that must be followed, not disregarded
 Interior also argues that construing "may" to mean "must" would work an absurd result:
 "[T]he presence of the phrase 'and other factors relevant to determining the reasonableness of the costs' at the end of the list of factors is inconsistent with a mandatory construction of the word 'may' in the same sentence .... By what standard could [the Secretary's] compliance with a direction to consider 'other factors' be measured?"
 Interior Brief, Nevada Power Co., at 17. Interior's argument is not persuasive. The "other factors" phrase is a recognition of the Secretary's greater expertise and discretion in the administration of applications relating to the public lands. The Secretary is directed to consider five specified factors and whatever additional factors he determines in his discretion to be relevant to determining reasonable costs.
 
 
 [8]
 We find this language quite persuasive. Conference committee reports carry great weight in the discernment of congressional intent. Being commended to the entire Congress, they are more likely to have received the attention and concurrence of the voting members of both the House and Senate prior to a bill's passage than are other sources from within the array of legislative history. See American Jewish Congress v. Kreps, 574 F.2d 624, 629 n. 36 (D.C.Cir.1978)
 However, the conference report is not the only piece of legislative history clearly indicating that the Secretary's observance of congressionally-defined "reasonableness factors" was intended to be more than discretionary. The notion that Interior was expected to examine such factors appears as early in the history as the house and senate reports on the respective bills. See H.R.Rep. No. 1163, 94th Cong., 2d Sess. 15, reprinted in 1976 U.S.Code Cong. & Ad.News 6175, 6189; S.Rep. No. 583, 94th Cong., 1st Sess. 56 (1975), reproduced in Sen. Comm. on Energy & Natural Resources, Legislative History of the Federal Land Policy & Management Act of 1976, at 121 (1978).
 
 
 [9]
 See Alumet v. Andrus, 607 F.2d 911, 916 (10th Cir.1979) (Congress intended by FLPMA § 304(b) that "the Secretary should consider the benefit to the general public" in assessing costs of EIS (emphasis added))
 This court did say in Beaver, Bountiful, Enterprise v. Andrus, 637 F.2d 749 (10th Cir.1980), that Interior "is allowed to take into account" the factors stated in § 304 in determining reasonable costs. Id. at 753. However, that case dealt with whether local governments were exempt from paying reimbursement fees for rights-of-way to be used by a nonprofit corporation formed by cities and towns to generate and transmit electricity to cities and towns. At issue was a specific exemption in the 1975 regulations providing that the reimbursement regulations "do not apply to (i) State or local governments or agencies" under certain circumstances. See id. at 751. The court's passing comment concerning § 304(b) was intended only to set a context for its discussion of the issue in the case. It is thus dicta and does not affect our analysis.
 
 
 [10]
 We do not accept the argument implicit in the stipulation recited in text that Interior could by purportedly considering "the efficiency to [sic] the government processing involved" eliminate other factors also required by Congress to be considered. Such reasoning, although leading neatly to Interior's conclusion that only actual costs of processing less overhead need be considered, completely negates Congress' explicit inclusion of the other factors--a result that Congress clearly did not intend. "The 'efficiency to the government processing involved' standard was not intended to serve as a rationale for the government's failure to take the other ... standards into account ...." Public Serv. Co. v. Watt (PSC II), C.A. No. 80-F-153, slip op. at 26 (D.Colo. July 2, 1981)
 
 
 [11]
 See 39 Fed.Reg. 31,906 (1974); 40 Fed.Reg. 17,841 (1975); 42 Fed.Reg. 55,280 (1977) (Sec. Order No. 3011); 44 Fed.Reg. 58,106 (1979); 45 Fed.Reg. 44,518 (1980)
 
 
 [12]
 We are aware that an administrative interpretation is entitled to deference. "Ordinarily, administrative interpretations of statutory terms are given important but not controlling significance." Batterton v. Francis, 432 U.S. 416, 424, 97 S.Ct. 2399, 2404, 53 L.Ed.2d 448 (1977). However, "regulations, in order to be valid, must be consistent with the statute under which they are promulgated." United States v. Larionoff, 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977). The Supreme Court explained in Batterton that varying degrees of deference are to be accorded to administrative interpretations of statutes, based on several factors. See 432 U.S. at 425 & n. 9, 97 S.Ct. at 2405 & n. 9. For example, where Congress expressly delegates the power to prescribe standards in interpreting and applying a statutory term, a resulting regulation is entitled to greater deference, because "Congress entrusts to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term." Batterton, 432 U.S. at 426, 97 S.Ct. at 2406. Here, however, Congress has itself prescribed standards to be used by Interior in applying the statutory term "reasonable costs." Although the application of those prescribed standards would be entitled to some degree of deference, the decision to ignore them is not. The regulations are "contrary to the manifest purpose of Congress in enacting the [statute], and hence invalid." Larionoff, 431 U.S. at 873, 97 S.Ct. at 2156. See Federal Maritime Comm'n v. Seatrain Lines, Inc., 411 U.S. 726, 745-46, 93 S.Ct. 1773, 1784-85, 36 L.Ed.2d 620 (1973)
 Interior also ventures the argument that Congress' subsequent failure in various appropriations acts to provide substantial funds for processing applications constitutes ratification of Interior's practice of charging actual costs to applicants. We do not find this argument persuasive. See TVA v. Hill, 437 U.S. 153, 189-93, 98 S.Ct. 2279, 2299-01, 57 L.Ed.2d 117 (1978); SEC v. Sloan, 436 U.S. 103, 119-23, 98 S.Ct. 1702, 1712-14, 56 L.Ed.2d 148 (1978).
 
 
 [13]
 The utilities' concern over EIS costs is not an insignificant one. For purposes of illustration only, we note that the utilities in PSC II were charged a total of $4,065,740.34 in direct and indirect costs. Rec., vol. III, at 216-17, p 55. Of the direct costs charged, 82.45% was allocated to costs of preparing environmental assessments and EISs. Rec., vol. IV, at 834. In the case of the Montana Power Co., which was billed a total of $1,335,826.60 in direct and indirect costs, Rec., vol. III, at 217, p 55, 95.12% of the direct costs billed was allocated to EIS and EA preparation, Rec., vol. IV, at 834
 
 
 [14]
 Public Service asserts that these costs arise in the following situations:
 "(1) When an applicant seeks a right-of-way from the BLM for a transmission line that is to cross not only BLM-supervised land but also private land, or public land supervised by another federal agency or owned by the State;
 "(2) When an applicant seeks a right-of-way across BLM-supervised land for a power line or other installation associated with a separate project (e.g., a power plant) for which no cost-reimbursable federal approval is otherwise required; and
 "(3) When an EIS or special study considers alternative routes (for transmission lines) and sites (for power plants).
 "In each case, the BLM includes in the EIS or special study an impact-analysis of the entire transmission line, the associated power plant or other project, and alternative routes and sites (as the case may be) and charges the full cost of such analyses to the right-of-way applicant."
 Brief for Public Service at 48-49 (footnotes omitted).
 
 
 [15]
 See H.R.Conf.Rep. No. 1724, 94th Cong., 2d Sess. 61, reprinted in 1976 U.S.Code Cong. & Ad.News 6228, 6233 (conferees "agreed to mention specifically the 'reasonable costs' of doing special studies and preparing environmental statements" (emphasis added))
 
 
 [16]
 As the trial court in Nevada Power Co. noted, " '[w]e are very cognizant of the extreme difficulty of this task--which resembles unscrambling eggs--but, as we interpret the law, it is necessary to bring the agency into compliance with the statute.' " Nevada Power Co. v. Watt, 515 F.Supp. 307, 325 (D.Utah 1981) (quoting Electronic Indus. Ass'n v. FCC, 554 F.2d 1109, 1117 (D.C.Cir.1976))
 
 
 [17]
 Beyond stating that Sierra Pacific "was not a party to [PSC I] ... and has not sought to bring itself under its rule," Reply Brief at 15, Interior presents us with no argument that the trial court incorrectly held the Government estopped. Even construing the above quoted comment to raise the issue, we hold that the trial court was correct in holding Interior estopped
 Under proper circumstances, collateral estoppel may be applied against the Government. See Montana v. United States, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). This case presents an issue of offensive collateral estoppel that is squarely within the guidelines laid down by the Supreme Court in Parklane Hosiery Co. v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). The trial court did not abuse the broad discretion vested in it to determine when offensive collateral estoppel should be applied. See id. at 331-33, 99 S.Ct. at 651-52. Having abandoned its appeal of PSC I, Interior has propounded no policy reason, much less one of national significance, to justify a refusal to apply collateral estoppel against the Government. See Barretto v. United States, 694 F.2d 603, 605-08 (9th Cir.1982); Mendoza v. United States, 672 F.2d 1320, 1325-30 (9th Cir.1982), cert. granted, --- U.S. ----, 103 S.Ct. 813, 74 L.Ed.2d 1012 (1983). But see Olegario v. United States, 629 F.2d 204, 214-16 (2d Cir.1980), cert. denied, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).
 
 
 [18]
 The Independent Offices Appropriation Act provides that:
 "It is the sense of the Congress that any ... privilege, authority, use, franchise, license, [or] permit, ... furnished, provided, granted, prepared, or issued by any Federal agency ... to or for any person ... shall be self-sustaining to the full extent possible, and the head of each Federal agency is authorized by regulation ... to prescribe therefor such fee, charge, or price, if any, as he shall determine ... to be fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts ...."
 31 U.S.C. § 483a (1976).
 
 
 [19]
 The right-of-way application at issue here was filed in 1973. The pre-FLPMA reimbursement regulations were promulgated in 1975. Colorado-Ute argues that even if upheld, the regulations may not be applied retroactively to recover costs incurred prior to their promulgation. We find this argument to be meritless. This precise question was considered and determined by this court in Hannifin v. Morton, 444 F.2d 200, 202-03 (10th Cir.1971)